# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
## No. 17-2025V
Filed: April 10, 2023

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *
STEPHANIE MYERS,                      *        Not For Publication
                                      *
             Petitioner,              *
v.                                    *        Motion for Attorneys' Fees and Costs;
                                      *        Reasonable Basis.
SECRETARY OF HEALTH                   *
AND HUMAN SERVICES,                   *
                                      *
             Respondent.              *
*  *  *  *  *  *  *  *  *  *  *  *  *  *
```

*Antoinette O'Neill, Esq.,* Parlatore Law Group, Washington, D.C., for petitioner.
*Christine Becer, Esq.,* US Department of Justice, Washington, D.C., for respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

**Roth**, Special Master:

On December 26, 2017, Stephanie Myers ("petitioner") Pro Se, filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program"). Petitioner alleged that she developed peripheral neuropathy after receiving an influenza ("flu") vaccine on January 13, 2015. *See* Petition at 1, ECF No. 1. In an amended complaint filed on November 6, 2018, petitioner alleged that that the flu vaccine caused her to develop either acute disseminated encephalomyelitis ("ADEM")[3] or central

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, it will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002 (codified as amended at 44 U.S.C. § 3501 note (2012)). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to delete medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will delete such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (1986). Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

[3] Acute disseminated encephalomyelitis is an acute or subacute encephalomyelitis or myelitis characterized by perivascular lymphocyte and mononuclear cell infiltration and demyelination; it occurs most often after an acute viral infection, especially measles, but may occur without a recognizable antecedent. It is believed to be a manifestation of an autoimmune attack on the myelin of the central nervous system. Symptoms include fever, headache, and vomiting; sometimes tremor, seizures, and

1

pontine myelinolysis ("CPM").[4] Amended Petition at 1, ECF No. 17. An Order concluding proceedings issued on July 27, 2020. ECF No. 44.

On January 25, 2021, petitioner filed a Motion for Attorneys' Fees pursuant to Section 15(e) of the Vaccine Act. ECF No. 46 ("Motion for Fees"). On February 8, 2021, respondent filed a response opposing that Motion and raising reasonable basis. ECF No. 47 ("Response").

Petitioner seeks attorneys' fees in the total amount of **$5,664.00**. *See* Motion for Fees. No costs were requested, and petitioner affirmed that she did not personally incur any costs associated with this claim. *Id.* at 1, 5. After careful consideration, petitioner's Motion for Attorneys' Fees is **granted** for the reasons set forth below.

# I.    Background

## A.  Procedural History

Petitioner, acting pro se, filed her petition on December 26, 2017. Petition, ECF No. 1. No medical records accompanied the petition. Petitioner also filed a Motion to Proceed Informa Pauperis. ECF No. 3. The next day the case was assigned to the undersigned. ECF No. 5.

An initial status conference was held on February 21, 2018, after which petitioner was ordered to file medical records in support of her claim and a status report on her progress in obtaining counsel. ECF Nos. 8-9.

On May 11, 2018, petitioner filed a motion to substitute Attorney O'Neill—an attorney new to the Vaccine Program—as counsel, which was granted. ECF No. 10. On May 16, 2018, petitioner's Motion to Proceed Informa Pauperis was denied, as she was represented by counsel. ECF No. 12.

A status conference was held on June 12, 2018, after which petitioner was ordered to file medical records. ECF No. 13.

On September 7, 2018, petitioner filed a Motion for Extension of Time within which to file her medical records, which was granted the same day. ECF No. 15. On November 6, 2018, petitioner filed medical records and an amended petition, alleging that petitioner developed either

---

paralysis; and lethargy progressing to coma that can be fatal. Many survivors have residual neurologic deficits. *Acute disseminated encephalomyelitis, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=73033&searchterm=acute+disseminated+encephalomyelitis* (last visited Mar. 30, 2023).

[4] Central pontine myelinolysis is symmetric demyelination affecting the base and tegmentum of the pons, possibly caused by rapid correction of hyponatremia, and characterized by rapidly progressing paraparesis or quadriparesis, dysarthria, dysphagia, and impaired consciousness; areas of demyelination may also occur outside the pons. *Central pontine myelinolysis, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=91190&searchterm=central+pontine+myelinolysis* (last visited Mar. 30, 2023).

ADEM or CPM as a result of the flu vaccine. Amended Petition, ECF Nos. 16-17. The amended petition further noted that petitioner "has yet to receive a definitive, confirmed diagnosis". *Id.* at 1.

In his status report filed on February 11, 2019, respondent requested that petitioner file several outstanding medical records. ECF No. 19. Petitioner filed two Motions for Extension of Time within which to file the requested records. Both were granted. ECF Nos. 21-22. Petitioner filed the requested medical records on June 10, 2019. Petitioner's Exhibits ("Pet. Ex.") 1-11, ECF Nos. 23-33.

On August 7, 2019, respondent filed a status report advising that he intended to continue defending this case. ECF No. 35. Respondent filed his Rule 4(c) Report on September 23, 2019, which included his position that this case was not appropriate for compensation and requesting several records, including the records of petitioner's foot surgery, the ER record from March 23, 2015, and the record of her previous lumbar spine surgery. ECF No. 36. Petitioner requested an extension of time to file the missing medical records, which was granted on November 22, 2019. ECF No. 38.

Petitioner filed a statement of completion on January 6, 2020, advising that she never had spinal surgery—only a spinal tap—and that the emergency room record from March 23, 2015 does not exist. ECF No. 39. On March 3, 2020, respondent filed a status report, advising that there were no additional missing medical records beyond what was already requested. ECF No. 40. Petitioner was then ordered to file an expert report. Petitioner filed a Motion for Extension of Time on May 1, 2020 to file her expert report by July 1, 2020, which was granted. ECF No. 41.

On July 10, 2020, petitioner's counsel advised that she intended to withdraw the claim. Petitioner was ordered to file a Motion for Dismissal Decision by July 27, 2020. ECF No. 42. On July 24, 2020, petitioner submitted a notice of intent to withdraw petition. ECF No. 43. On July 27, 2020, an Order Concluding Proceedings Pursuant to Vaccine Rule 21(a) issued. ECF No. 44.

On January 25, 2021, petitioner filed a Motion for Attorneys' Fees. Motion for Fees, ECF No. 46. Petitioner's counsel did not request reimbursement of any costs, and petitioner affirmed that she personally did not incur costs associated with her claim. *Id.* at 1, 5. Respondent filed his Response on February 8, 2021 opposing petitioner's motion and asserting a reasonable basis of the claim. Response, ECF No. 47. Petitioner did not file a Reply.

This matter is ripe for consideration.

## B.  Summary of Relevant Medical Records[5]

---

[5] The medical records are not labeled with exhibit numbers, but the exhibit numbers are contained on the docket when filed. The exhibit numbers listed on the docket will be used to identify the records. However, petitioner filed two records as "Exhibit #1"; the first record filed on November 6, 2018 will be referred to as "Pet. Ex. 1a" and the second filed on June 10, 2019 will be referred to as "Pet. Ex. 1b". *See* ECF Nos. 16, 23. Additionally, several medical records are handwritten and illegible. The medical summary below is what can best be gleaned from the handwritten records.

Petitioner was 64 years old at the time of the subject January 13, 2015 influenza vaccine. Pet. Ex. 1a at 55. Her prior medical history included hyperparathyroidism and osteoporosis. Pet. Ex. 1b at 1. She fell in January 2015 but did not seek care. Pet. Ex. 4 at 1; *see also* Pet. Ex. 1b at 1.

Petitioner presented on February 5, 2015, for a pre-operative evaluation with Towson Medical Associates, LLC ("Towson") for upcoming left foot surgery. She reported feeling fine but had tingling in her fingertips. Pet. Ex. 1a at 168. She was scheduled for foot surgery on February 11, 2015.[6] *Id.*; Pet. Ex. 1b at 1.

On March 27, 2015, petitioner returned to Towson for follow up from an emergency room ("ER") visit on March 23, 2015.[7] Pet. Ex. 1a at 167. The record documents that petitioner was seen in the ER several hours after left foot surgery for slurred speech and falling. Stroke evaluation was negative.[8] *Id.*  She reported that she has felt fine since. *Id.*

Petitioner returned to Towson on April 11, 2015 reporting bilateral numbness and tingling in the upper and lower extremities. Pet. Ex. 1a at 164-65. She reported episodes of transient abnormal speech twice a day. She had no focal weakness. *Id.* at 164. She was hospitalized March 23 to 24 for GBS[9] and falls and was now walking with boot. *Id.* at 165.

Petitioner returned to Towson on April 15, 2015, reporting daily episodes of arms and legs being "floppy + wobbly" and having slurred speech. Pet. Ex 1a at 162-63.

At a neurological examination on May 14, 2015, petitioner reported that after her foot surgery, her arms and legs felt "rubbery", her speech was slurred, she had profuse sweating, and occasional shocks in her hands. Pet. Ex. 9 at 9-10. The assessment included possible posterior circulation insufficiency vs. partial seizures vs. migraine equivalents by exclusion. *Id.* Multifactorial gait disorder and possible cervical myelopathy were also considered. *Id.* An electroencephalogram ("EEG") and computerized tomography angiography ("CTA") of the head and neck were ordered. *Id.* The same day, petitioner had a follow up at Towson, where it was noted that she had episodes of weakness, but not complete paralysis, legs and arms felt like jelly, slurring of speech, and facial droop. *Id.* at 161. She was instructed to see an Ear, Nose, and Throat specialist ("ENT"). *Id.* at 158.

Petitioner returned to Towson on June 10, 2015. She had a dizzy spell, fell, and needed stitches. Pet. Ex. 1a at 157. On June 17, 2015 petitioner presented for an EEG to evaluate for possible seizures versus syncope. Pet. Ex. 9 at 3. She reported slurred speech and weakness at a visit on June 24, 2015. Pet. Ex. 1a at 155. Petitioner's assessment at Towson on June 29, 2015, was possible posterior circulation transient ischemic attack, hypertension, multifactorial gait disorder, and syncopal type episodes. Pet. Ex. 9 at 2. The results of the EEG were unremarkable. *Id.* at 1.

---

[6] A record of petitioner's foot surgery could not be located in the medical records filed, and the date of her foot surgery is inconsistent in the records.

[7] According to petitioner, a record for this ER visit does not exist. *See* ECF No. 39.

[8] There are no records filed for this visit. *See* ECF No. 39. This is based on petitioner's reporting alone.

[9] This record was not filed. *See* ECF No. 39.

A July 1, 2015 medical record documents recurrent falling. Pet. Ex. 8 at 99. An echocardiogram on July 9, 2015 revealed syncope, hypertension, and arrhythmia. Pet. Ex. 2.

Petitioner returned to Towson on July 21, 2015, complaining of increased weakness and numbness in her hands. Pet. Ex. 1a at 150. She was diagnosed with cellulitis of the right leg and spells of weakness. *Id.* She returned to Towson two days later with the same symptoms. *Id.* at 148. On July 29, 2015, she reported worsening symptoms, persistent right leg cellulitis, ataxia, and clumsiness in hands. Pet. Ex. 8 at 93-94.

Petitioner's medical record for August 18, 2015 included a fall in which she hit her face on a nightstand. Pet. Ex. 1a at 141. She reported that her head felt okay but she had pain in her mid-back. *Id.* On August 24, 2015, she presented for severe back pain. Pet. Ex. 8 at 86. She presented again on August 31, 2015 for ongoing pain, where she reported taking more hydrocodone and worsening numbness in her hands and feet. *Id.* at 84.

An examination on September 3, 2015 to evaluate for neuropathy, polyneuropathy, plexopathy, and radiculopathy resulted in findings consistent with right C-6 cervical radiculopathy[10] and right L4-S1 lumbosacral radiculopathy. Pet. Ex. 1a at 94-95. Deep tendon reflexes were 0-1 bilaterally, with mild stocking sensory distribution loss, motor power of 5 to 5-/5 in both upper and lower extremities, and an antalgic gait. Pet. Ex. 9 at 7-8. An EMG revealed evidence of an underlying polyneuropathy.[11] *Id.* Petitioner was diagnosed with multifactorial gait disorder and cervical and lumbar disc disease. *Id.*

Petitioner was noted to have compression fractures of the thoracic spine on September 8, 2015. She was prescribed Gabapentin. Pet. Ex. 1a at 134-35; Pet. Ex. 8 at 82. A cervical MRI on September 10, 2015 revealed severe disc space narrowing, moderate stenosis, and edema of the cord extending 8mm in the cephalocaudal[12] dimension. Pet. Ex. 1a at 97. An MRI of the lumbar spine revealed past right-sided hemilaminotomies[13] at L4-5 and L5-S1, as well as moderate to severe bilateral neural foraminal stenosis at L4-5 and L5-S1. *Id.* at 90-91.

---

[10] Radiculopathy is disease of the nerve roots, such as from inflammation or impingement by a tumor or a bony spur. *Radiculopathy, Dorland's Medical Dictionary Online,* *https://www.dorlandsonline.com/dorland/definition?id=42742&searchterm=radiculopathy* (last visited Mar. 30, 2023).

[11] Polyneuropathy refers to neuropathy of several peripheral nerves simultaneously. *Polyneuropathy,* *Dorland's Medical Dictionary Online,* *https://www.dorlandsonline.com/dorland/definition?id=40203&searchterm=polyneuropathy* (last visited Mar. 30, 2023).

[12] The term cephalocaudal pertains to the long axis of the body, in a direction from head to tail. *Cephalocaudal, Dorland's Medical Dictionary Online,* *https://www.dorlandsonline.com/dorland/definition?id=8638&searchterm=cephalocaudal* (last visited Apr. 5, 2023).

[13] A hemilaminotomy is a procedure during which the neurosurgeon removes the lamina only on one side of the spinal canal, the side that requires decompression. *Hemilaminotomy, Brain & Spine Center of Texas,* https://www.brainandspineoftexas.com/lumbar-spine-surgery/hemilaminotomy/ (last visited Apr. 5, 2023). This record appears to indicate that petitioner did in fact have some form of procedure on her

At a visit on September 18, 2015, petitioner was noted as a complicated 64-year-old with a 6-month history of progressive gait dysfunction, episodic dysarthria,[14] cervical myelopathy[15] at C4-5, falling episodes with lacerations, and recent fracture. Pet. Ex. 1a at 131. On September 23, 2015, petitioner underwent cervical surgery. Pet. Ex. 1a at 107-09, 131; Pet. Ex. 10 at 1-106; Pet. Ex. 8 at 54.

Petitioner presented to St. Joseph the following day with onset of slurred speech and difficulty walking that started four hours before. Pet. Ex. 10 at 118, 120. Her symptoms were "identical to everything she has always experienced with the exception that it was a little bit more severe." *Id.* at 119. The ER doctor wanted to admit her for transient ischemic attack, but petitioner refused a chest x-ray and CAT scan. *Id.* at 118. The discharge diagnosis was dysarthria. *Id.* at 119.

Petitioner was subsequently admitted to the hospital on September 29, 2015 for "worsening of her chronic neurologic problem, which is as of yet undetermined." Pet. Ex. 10 at 150. Her problem list included acute cystitis without hematuria, systemic inflammatory response syndrome, orthostatic hypotension, cervical spondylosis with myelopathy, and neurologic disorder. *Id.* at 139; *see also* Pet. Ex. 8 at 54. Her ongoing neurologic problems began in January 2015 with altered sensation, brief episodes of weakness in her arms and legs and slurred speech. Pet. Ex. 10 at 147, 158. Multiple work ups have been negative/normal. *Id.* She had cervical surgery last week to reduce cord compression and was discharged but returned the next day with numbness, tingling, and weakness in her arms and legs. *Id.* She now had facial droop, slurred speech, and inability to walk without holding onto things. *Id.* The diagnosis was neurologic abnormality. *Id.* at 151. She was discharged October 1, 2015.

At a follow up visit on October 9, 2015, she reported that her spells of dysarthria were a bit better and shorter, but her spells of weakness lasted for hours and she still had pain. Pet. Ex. 8 at 77. An arterial Doppler of her legs performed on October 13, 2015 showed no significant arterial occlusive disease. Pet. Ex. 5 at 1, 3. She was using a walker to ambulate. *Id.* She fell again on October 15, 2015 requiring medical attention. Pet. Ex. 8 at 74. Klonopin was prescribed on October 23, 2015. She reported continuing shoulder and rib cage pain on that date. *Id.* at 72.

On November 20, 2015, petitioner requested a referral to a psychiatrist[16] who treats conversion disorders. Pet. Ex. 8 at 71; Pet. Ex. 1a at 123. She suffered with cervical myelopathy, depression, and right foot vascular abnormality. Pet. Ex. 8 at 70.

---

spine that showed up on her MRI, in contrast to her statement that she has never had spinal surgery. *See* ECF No. 39.

[14] Dysarthria is a speech disorder consisting of imperfect articulation due to loss of muscular control after damage to the central or peripheral nervous system. *Dysarthria, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=15144&searchterm=dysarthria* (last visited Mar. 30, 2023).

[15] Myelopathy is any of various functional disturbances or pathologic changes in the spinal cord, often referring to nonspecific lesions in contrast to the inflammatory lesions of myelitis. *Myelopathy, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=32732&searchterm=myelopathy* (last visited Mar. 30, 2023).

[16] No psychiatry records were filed in this matter.

Petitioner presented to Towson on December 11, 2015 reporting that she was under the care of a psychiatrist and in need of a referral for a psychologist and physical therapy. She expressed a desire to drive again. She reported that her episodes continued but the sweating had decreased. Pet. Ex. 8 at 69. Her cervical myelopathy was noted to be improving. Pet. Ex. 1a at 121-22.

A January 13, 2016 brain MRI showed moderate atrophy with T2 hyperintensity that may be related to chronic small vessel white matter disease. Pet. Ex. 1a at 38. There was also a large area of central pontine T2 hyperintensity suspicious for central pontine myelinolysis.[17] *Id*. A cervical MRI showed signal abnormality within the cord at C5 consistent with findings on September 10, 2015. *Id*. at 197-98.

Petitioner reported worsening symptoms typically in the morning during a visit to Towson on February 10, 2016. Pet. Ex. 8 at 7. Her MRI of the brain performed on February 11, 2016 showed extensive abnormal white matter disease representative of demyelination or gliosis.[18] Pet. Ex. 1a at 39-40; *see also* Pet. Ex. 7 at 1; Pet. Ex. 11 at 1-2.

At a February 18, 2016 visit with a neurologist, petitioner provided a history beginning in January of 2015 when her "legs gave way" and she fell in a grocery store which occurred again a few weeks later. Pet. Ex. 1a at 4; *see also* Pet. Ex. 4 at 1. In March 2015, she had a sudden onset of foot pain and x-rays showed broken bones.[19] Pet. Ex. 1a at 4. After foot surgery, she fell twice and had slurred speech. *Id*. Since then, she has had episodes of "legs feeling like jelly, slurred speech, and involuntary movements of her legs more so than arms." *Id*. Her cervical surgery with improved neck sweating was noted but the remainder of her symptoms persisted. *Id*. An MRI was interpreted as central pontine demyelination versus ischemic disease. *Id*. at 6. A February 22, 2016, angiogram showed no evidence of focal high-grade stenosis or occlusion of the neck vessels. Pet. Ex. 6 at 3.

Petitioner returned to Towson at her neurologist's request on March 8, 2016, for orthostatics.[20] Pet. Ex. 8 at 9. Her ongoing symptoms of falling, numbness in fingers, sweating, and slurred speech since last summer were noted; all scans were negative. *Id*. At a follow up visit on March 23, 2016, she was noted to be using a walker and wheelchair. Pet. Ex. 1a at 64. She still had pain in her lower back and the episodes of weakness were longer and more severe. *Id*.

---

[17] *See supra* note 4.

[18] Gliosis is an excess of astroglia in damaged areas of the central nervous system. *Gliosis, Dorland's Medical Dictionary Online,* https://www.dorlandsonline.com/dorland/definition?id=20342&searchterm=gliosis (last visited Apr. 5, 2023).

[19] Petitioner did not file records of x-rays showing broken bones, or for left foot surgery in March 2015. *See* ECF No. 39.

[20] Orthostatics refer to vital signs taken while standing. *Preventing Falls in Hospitals, Agency for Healthcare Research and Quality,* https://www.ahrq.gov/patient-safety/settings/hospital/fall-prevention/toolkit/orthostatic-vital-sign.html (last visited Apr. 5, 2023).

Petitioner's symptoms continued. She received a cortisone shot for shoulder pain. Pet. Ex. 8 at 13. In June 2016, she was noted to have scabs from falls, edema, urgent urination, tremors mostly in her head, peripheral neuropathy, numb feet, and trouble swallowing. Pet. Ex. 1a at 57. She had progressive neurological degeneration and a lift chair to stand was needed. *Id*. at 58.

Petitioner was evaluated at Johns Hopkins on July 13, 2016. Pet. Ex. 3 at 11, 17, 22, 54. EMG testing showed "severe reduction of amplitudes in peroneal and tibial nerves, distal latency is prolonged and conduction velocity is reduced in these nerves likely from the loss of large fibers and cool limb. Upper extremity conduction studies are normal except for reduced velocity across the elbow section of the right ulnar nerve." *Id*. at 18. There were a few chronic neurogenic changes in the distal leg muscle. *Id*. The impression was a length dependent sensory motor axonal polyneuropathy, right median neuropathy at the wrist and right ulnar neuropathy at the elbow. *Id*. at 54. She complained of severe headaches. *Id*. at 40.

At her examination with neurologist Dr. Khoshnoodi at Johns Hopkins on that same date, she reported being at a wedding in May 2015 when she began feeling really hot and sweaty and had to leave. Pet. Ex. 3 at 29-33; Pet. Ex. 1a at 206-10. Her fingers felt numb, and she started dropping things. She then noticed some numbness and tingling in her toes, started stumbling then falling. *Id*. Around June, she developed episodes of slurred speech. Pet. Ex. 3 at 30. These episodes could last for hours, the shortest being about half an hour and most occurred in the morning. She also had episodes of blurry or double vision. She mostly used a wheelchair and could not walk unassisted. Dr. Khoshnoodi noted bone marrow biopsy results consistent with CLL. She was taking hydroxyurea. She was pre-diabetic with a HgbA1C of 6.1. Dr. Khoshnoodi's assessment included: (1) myelopathy consistent with known cervical spinal cord edema, likely irreversible due to damage already done, despite decompressive surgery, (2) sensorimotor axonal polyneuropathy of unknown etiology "but her prediabetes could play a role", (3) balance issues and falls with her myelopathy and sensory ataxia as the main contributing factors, and (4) episodes of slurred speech which are difficult to explain, although an ambulatory EEG may be helpful in elucidating. He also recommended measuring her blood glucose during these episodes. *Id*. at 33.

Petitioner returned to her primary neurologist on July 20, 2016 with worsening in her condition including spontaneous and variable gait instability, slurred speech, dysphagia, auditory hallucinations, blurry vision, and diplopia[21] at random. Pet. Ex. 1a at 15. "Today, [petitioner and her children] recalled she had a flu shot right before the first episode." *Id*. at 16. She was mostly wheelchair bound and a social worker was looking into other living arrangements. *Id*. at 15. Her CSF was consistent with inflammation but not abnormal cells. *Id*. at 19. Her symptoms were not consistent with a peripheral nerve process. It was suspected that petitioner had "an event", possibly ADEM,[22] though ADEM typically did not have the significant progression petitioner had. CPM was also possible given her depression and dehydration in the months leading up to symptom onset. *Id*. at 16. Repeat MRIs were ordered. The fluctuation of symptoms could be related to stress or anxiety on top of an underlying disorder. *Id*. at 19.

---

[21] Diplopia is the perception of two images of a single object. *Diplopia, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=14354&searchterm=diplopia* (last visited Apr. 5, 2023).

[22] *See supra* note 3.

Petitioner suffered another fall on July 25, 2016 and presented to St. Joseph's ER for treatment of an injury to her right shoulder. Pet. Ex. 10 at 256. She then underwent an MRI of the thoracic spine on August 11, 2016 which showed remote compression deformities of TS and L1, some small central disc herniation at T2-3, a large hiatal hernia, but no cord compression or abnormal enhancement. Pet. Ex. 1a at 49-50; *see also* Pet. Ex. 7 at 7. On August 30, 2016, petitioner had an MRI of the cervical spine which were consistent with postoperative changes from spinal fusion of C4-5 level; spondylotic changes with mild spinal stenosis at C3-4 level; spondylotic changes with neuroforaminal stenosis at C3-4 and C6-7 levels; but no concerning areas of abnormal enhancement. Pet. Ex. 7 at 2.

Petitioner returned to St. Joseph's on October 2, 2016 with worsening and severe shoulder pain. Pet. Ex. 10 at 280. A repeat brain MRI on October 13, 2016, when compared to the February 11, 2016, was stable. Pet. Ex. 1a at 51-52; *see also* Pet. Ex. 7 at 4. The impression was: "[s]table [extensive] white matter disease probably related to severe small vessel disease." Pet. Ex. 1a at 52.

At a follow up visit with her primary neurologist on October 20, 2016, petitioner still had paresthesia in her legs, episodes of gait instability, slurred speech, intermittent blurred vision, diplopia, and dysphagia with less limb jerking. Pet. Ex. 1a at 22-28; *see also* at Pet. Ex. 4 at 8. She had three falls since her last visit and hears constant hammering. She no longer has nursing, social work, or therapy services. *Id*. Though CPM and ADEM were "always entertained" as the diagnosis, the etiology of her symptoms "remains elusive." Pet. Ex. 1a at 23.

Petitioner's MRIs were reviewed at Johns Hopkins on November 8, 2016. Pet. Ex. 3 at 95. The impression was: (1) diffuse abnormal pontine T2/FLAIR hyperintense signal with differential of chronic small vessel ischemic change due to age, prior demyelinating process, or conceivably prior central pontine myelinolysis, (2) chronic microvascular ischemic changes and global parenchymal volume loss, (3) marked compression deformity of the T8 vertebral body with resultant mild to moderate focal kyphosis, and (4) large hiatal hernia with herniation of the entire or nearly the entire stomach. *Id*. She was seen for "motor neuron disease". *Id*. at 96.

Petitioner suffered another fall due to gait imbalance and presented to St. Joseph on November 15, 2016 with multiple rib fractures and a compression fracture. Pet. Ex. 10 at 302, 305.

When petitioner presented to her neurologist on September 7, 2017 with increased symptoms, her neurologist reached out to Dr. Khoshnoodi at Johns Hopkins who agreed that the most likely diagnosis was CPM or ADEM. Pet. Ex. 1a at 29. A "temporal relationship with the flu vaccine as symptom onset occurred after receiving the flu vaccine" was documented. *Id*. at 30.

No further medical records were filed.

## II.    Discussion

The Vaccine Act permits an award of "reasonable attorneys' fees" and "other costs." § 15(e)(1). If a petition results in compensation, petitioner is entitled to reasonable attorneys' fees and costs. *Id.*; *see Sebelius v. Cloer*, 569 U.S. 369, 373 (2013). Where a petitioner does not prevail

on entitlement, a special master has discretion to award reasonable fees if the petition was brought in "good faith" and with a "reasonable basis" for the claim to proceed. § 15(e)(1). A petitioner's good faith is presumed "in the absence of direct evidence of bad faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Where no evidence of bad faith exists and respondent does not challenge petitioner's good faith, good faith requires no further analysis.

In the instant case, the undersigned has no basis to believe, and respondent does not argue, that petitioner did not bring her claim in good faith. Therefore, the undersigned finds that the petitioner brought her claim in good faith.

### A. Reasonable Basis

### 1. Legal Standard

In discussing the reasonable basis requirement, the Federal Circuit stressed the prima facie petition requirements of § 11(c)(1) of the Act. *Cottingham ex. rel. K.C. v. Sec'y of Health & Human Servs.*, 971 F.3d 1337, 1345-46 (Fed. Cir. 2020). Specifically, the petition must be accompanied by an affidavit and supporting documentation showing that the vaccinee:

> (1) received a vaccine listed on the Vaccine Injury Table;
> (2) received the vaccination in the United States, or under certain stated circumstances outside of the United States;
> (3) sustained (or had significantly aggravated) an injury as set forth in the Vaccine Injury Table (42 C.F.R. § 100.3(e)) or that was caused by the vaccine;
> (4) experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and
> (5) has not previously collected an award or settlement of a civil action for damages for the same injury.

*Cottingham*, 971 F.3d at 1345-46.

Reasonable basis is an objective inquiry, irrespective of counsel's conduct or a looming statute of limitations, that evaluates the sufficiency of records available at the time a claim is filed. *Simmons v. Sec'y of Health & Human Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017); *see Turpin v. Sec'y of Health & Human Servs.*, No. 99-564, 2005 WL 1026714 at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005). A special master's evaluation of reasonable basis focuses on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient objective evidence to make a feasible claim for recovery. *Santacroce v. Sec'y of Health & Human Servs.*, No. 15-555V, 2018 WL 405121 at *7 (Fed. Cl. 2018).

Reasonable basis is satisfied when there is more than a mere scintilla of objective evidence, such as medical records or medical opinions, supporting a feasible claim before filing. *See Cottingham*, 971 F.3d at 1346; *see Chuisano v. Sec'y of Health & Human Servs.*, 116 Fed. Cl. 276, 286 (2014) (citing *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 303, 303 (2011)); s*ee Silva v. Sec'y of Health & Human Servs.*, 108 Fed. Cl. 401, 405 (2012). A recent attempt to clarify what quantifies a "scintilla" looked to the Fourth Circuit, which characterized "more than

a mere scintilla of evidence" as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham v. Sec'y of Health & Human Servs.,* 154 Fed. Cl. 790, 795 (2021) (quoting *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 765 (4th Cir. 2021)). Additionally, absence of an express medical opinion of causation is not necessarily dispositive of whether a claim has a reasonable basis. Medical records may support causation even where the records provide only circumstantial evidence of causation. *James-Cornelius on Behalf of E.J. v. Sec'y of Health & Human Servs.*, 984 F.3d 1374, 1379-80 (Fed. Cir. 2021).

Evaluation of reasonable basis is limited to the objective evidence submitted. *Simmons*, 875 F.3d at 636. Still, a special master is not precluded from considering objective factors such as "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Human Servs.*, 138 Fed. Cl. 282, 289 (2018). In *Cottingham*, the Federal Circuit expressly clarified that special masters are permitted to utilize a totality of the circumstances inquiry in evaluating reasonable basis, including, but not exclusively limited to, objective factors such as those identified in *Amankwaa. See Cottingham,* 971 F.3d at 1344. The Federal Circuit reiterated that counsel conduct is subjective evidence not to be considered when evaluating reasonable basis. *Id.* at 1345. Counsel's attempt or desire to obtain additional records before filing is subjective evidence and does not negate the objective sufficiency of evidence presented in support of a claim. *James-Cornelius,* 984 F.3d at 1381. The Federal Circuit has additionally articulated that special masters cannot broadly categorize all petitioner affidavits as subjective evidence or altogether refuse to consider petitioner's sworn statements in evaluating reasonable basis. *Id.* at 1380 (holding that factual testimony, when corroborated by medical records and a package insert, can amount to relevant objective evidence for supporting causation). However, a petitioner's own statements cannot alone support reasonable basis, and special masters may make factual determinations as to the weight of evidence. *See, e.g., Chuisano*, 116 Fed. Cl. at 291; *Foster v. Sec'y of Health & Human Servs.*, No. 16-1714V, 2018 WL 774090, at *3 (Fed. Cl. Spec. Mstr. Jan. 2, 2018); *Cottingham*, 971 F.3d at 1347.

While absent or incomplete records do not strictly prohibit a finding of reasonable basis, an overwhelming lack of objective evidence will not support reasonable basis. *Chuisano*, 116 Fed. Cl. at 288; *see Simmons,* 875 F.3d at 634-36 (holding that reasonable basis was not satisfied where 1) petitioner's medical record lacked proof of vaccination and diagnosis and 2) petitioner disappeared for two years before filing a claim). The objective evidence in the record must also not be so contrary that a feasible claim is not possible. *Cottingham*, 154 Fed. Cl. at 795, citing *Randall v. Sec'y of Health & Human Servs.,* No. 18-448V, 2020 WL 7491210, at *12 (Fed. Cl. Spec. Mstr. Nov. 24, 2020) (finding no reasonable basis when petitioner alleged a SIRVA injury in his left arm though the medical records indicated that the vaccine was administered in petitioner's right arm). A claim may lose reasonable basis as it progresses if further evidence is unsupportive of petitioner's claim. *See R.K. v. Sec'y of Health & Hum. Servs.,* 760 F. App'x 1010, 1012 (Fed. Cir. 2019) (citing *Perreira v. Sec'y of Health & Human Servs.,* 33 F.3d 1375, 1376–77 (Fed. Cir. 1994)).

Though a special master has broad discretion, a special master must keep in mind the Vaccine Act's remedial objective of maintaining petitioners' access to willing and qualified legal assistance, and a special master may not abuse their discretion in denying reasonable basis and fees. *See James-Cornelius,* 984 F.3d at 1381.

### B.  The Parties' Arguments

### 1.  Petitioner's Argument

Petitioner noted that she filed her claim pro se, was encourage by the Court to retain counsel and re-file her petition. Motion for Fees at 1. At the time of filing, petitioner was undergoing medical care and did not have a definitive diagnosis. *Id*. While trying to obtain a diagnosis, though, the time allotted for filing a petition was running out. *Id*. at 2.

Petitioner argued that the differential diagnoses listed in petitioner's records "could be explained by the vaccine she received." Motion for Fees at 1. Her treaters were "clearly exploring a diagnosis" with GBS, among one of the conditions. *Id*. at 1-2. "Petitioner's counsel had every reason . . . to believe that a diagnosis . . . would be forthcoming". *Id*. At 1.

Petitioner submitted when her doctors were unable to render a definitive diagnosis, it became clear that an expert would be unable to link petitioner's condition to the vaccine. Motion for Fees at 2. Petitioner believes her condition is vaccine-related but acknowledged her inability to meet her burden of proof. *Id*. Thus, petitioner withdrew her claim to avoid additional expenses. Nevertheless, this "does not diminish the good cause that existed when filing and attempting to make a case while medical care was still being sought." *Id*.

### 2.  Respondent's Argument

Respondent argues that petitioner failed to establish a reasonable basis for her claim and the Motion for Fees should be denied. Response at 1. No challenge to good faith was raised. *Id*. at 3 n.1.

Respondent submitted that reasonable basis is an objective standard and relates to the "factual basis" or "merits of petitioner's claim". Response at 3-4, citing *McKellar*, 101 Fed. Cl. at 305; *Simmons*, 875 F.3d at 633-36; *Cottingham*, 971 F.3d at 1344. To that end, petitioner's contemporaneous medical records do not provide objective evidence in support of ADEM or CPM being causally linked to the flu vaccine. Response at 5. Further, petitioner was never actually diagnosed with ADEM or CPM. *Id*. at 6. Respondent relies on Dr. Khoshnoodi's July 14, 2016[23] assessment and submits that it "undermines any statement that he confirmed the diagnosis" as ADEM or CPM. *Id*. at 6 n.3; *see also* Pet. Ex. 3 at 28-30.

In sum, respondent argues that petitioner was not diagnosed with the injuries alleged in the petition, she did not provide more than a scintilla of objective evidence in support of causation, and no expert reports were filed. Response at 6. Thus, there was no reasonable basis to file the claim. *Id*. at 5, 6.

### III.    Analysis of Reasonable Basis

Consistent with *Cottingham*, petitioner has filed contemporaneous and facially trustworthy

---

[23] The record shows that this visit took place on July 13, 2016. Pet. Ex. 3 at 29-30.

medical records demonstrating: (1) that petitioner received a covered vaccine; (2) that the vaccine was administered in the United States; (3) that petitioner experienced symptoms she alleges are associated with her vaccine; and (4) that these symptoms persisted for at least six months. 971 F.3d at 1345-46.

Petitioner's burden for reasonable basis is satisfied when there is "more than a mere scintilla of evidence" defined as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham,* 154 Fed. Cl. at 795 (quoting *Sedar*, 988 F.3d at 765). Although petitioner voluntarily dismissed her claim prior to retaining an expert, the Federal Circuit held that the absence of an express medical opinion of causation is not necessarily dispositive of whether a claim has a reasonable basis. *James-Cornelius*, 984 F.3d at 1379-80. Petitioner need not prove causation to satisfy reasonable basis. *See* § 300aa-15(e)(1); *see also Chuisano*, 116 Fed. Cl. at 287; *P.S. v. Sec'y of Health & Human Servs*., No. 16-834V, 2022 WL 16635456, at *18 (Fed. Cl. Spec. Mstr. Oct. 6, 2022).

The medical records filed contain sufficient evidence to satisfy petitioner's burden of more than a mere scintilla of objective evidence to support a reasonable inference of causation. Petitioner received the subject flu vaccination on January 13, 2015. Pet. Ex. 1a at 55. She suffered a fall in January 2015 but did not seek care. Pet. Ex. 1a at 4; *see also* Pet. Ex. 4 at 1; Pet. Ex. 1b at 1. At a preoperative evaluation on February 5, 2015, she reported tingling in her fingertips. Pet. Ex. 1a at 168. The evidence filed shows that she developed gait dysfunction within a month of the subject flu vaccine that progressively worsened. *See* Pet. Ex. 4 at 1; Pet. Ex. 1b at 1; Pet. Ex. 1a at 4, 131; Pet. Ex. 10 at 147, 158, 168. In the two and a half years that followed, petitioner was examined by many specialists, submitted to a multitude of tests, underwent cervical surgery, was no longer walking and required a wheelchair—all without a definitive diagnosis. Pet. Ex. 1a at 4, 15, 22, 29, 64, 123, 131, 141, 150, 155, 157, 162-63, 164-65; Pet. Ex. 8 at 7, 9, 13, 57, 71, 72, 74, 77, 84, 93-94, 99; Pet. Ex. 10 at 118-20, 147, 150, 158, 302, 305.

When petitioner presented for neurological examination on February 18, 2016, she reported that in January of 2015, her "legs gave way" and she fell in a grocery store which occurred again a few weeks later. Pet. Ex. 1a at 4; *see also* Pet. Ex. 4 at 1. After foot surgery in March of 2015, she fell twice and had slurred speech. Pet. Ex. 1a at 4. She has since had episodes of "legs feeling like jelly, slurred speech, and involuntary movements of her legs more so than arms." *Id*. An MRI was interpreted as central pontine demyelination versus ischemic disease. *Id*. at 6. An evaluation at Johns Hopkins on July 13, 2016 along with EMG testing concluded she had sensory motor axonal polyneuropathy, right median neuropathy of the wrist and right ulnar neuropathy at the elbow. Pet. Ex. 3 at 11, 17, 18, 22, 54. She complained of severe headaches. *Id*. at 40.

Petitioner returned to her treating neurologist on July 20, 2016 with worsening symptoms, which included spontaneous and variable gait instability, slurred speech, dysphagia, auditory hallucinations, blurry vision, and diplopia at random. Her neurologist noted that "[t]oday, [petitioner and her children] recalled she had a flu shot right before the first episode." Pet. Ex. 1a at 15. When petitioner presented again to her treating neurologist on September 7, 2017 with increasing symptoms, her neurologist discussed her case with Dr. Khoshnoodi, and they agreed the most likely diagnosis was ADEM or CPM. *Id*. at 29-30. Her neurologist noted that there was

"a temporal relationship with the flu vaccine as symptom onset occurred after receiving the flu vaccine." *Id*. at 30.

Petitioner's failure to mention, recall, or associate her receipt of a flu vaccination in January of 2015 with the onset of symptoms until much later is of no import. The date of the occurrence of the first symptom or manifestation of onset "does not depend on when a petitioner knew or reasonably should have known anything adverse about her condition," or when a petitioner began to suspect an injury might have been caused by a vaccination. *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 1337, 1339 (Fed. Cir. 2011). It is understandable that petitioner may not have thought sooner about a connection between her flu vaccine in light of what was happening to her, her frequent doctor appointments, emergency room visits, and testing and her seemingly being a poor historian. There is no indication that she has any medical training or had any reason to believe the flu vaccine could be related to the onset of and progressing condition. Further, she along with her medical providers were focused on the severity of symptoms and trying to stop the progression of illness rather than determining an exact cause after obvious causes were ruled out. The opinion of her treating neurologist, along with the onset of symptoms occurring shortly after vaccination, constitutes objective evidence that would support a feasible claim of causation. While this evidence alone would be insufficient to prove causation, it is sufficient to meet the mere scintilla of objective evidence burden required for awarding fees.

Respondent's argument that petitioner's claim lacks a reasonable basis because she was not diagnosed with the injuries alleged in the petition, did not provide more than a scintilla of objective evidence "in support of causation", and did not file expert reports, conflates petitioner's burden in establishing reasonable basis with her burden in establishing causation. Response at 5, 6. Respondent cites to Dr. Khoshnoodi's July 13, 2016 record arguing that petitioner was not diagnosed with ADEM or CPM. Response at 6 n.3; *see* Pet. Ex. 3 at 29-33. This disregards the record in which petitioner's primary neurologist Dr. Konkel contacted Dr. Khoshnoodi to discuss petitioner's condition and the two agreed that the most likely diagnosis was either ADEM or CPM. Pet. Ex. 1a at 29-30. Several diagnoses were considered by petitioner's treating physicians over the course of her illness. Pet. Ex. 1a at 23, 38, 39-40, 52, 94-95; Pet. Ex. 2; Pet. Ex. 3 at 11, 17, 22, 33, 54; Pet. Ex. 7 at 1; Pet. Ex. 8 at 70; Pet. Ex. 9 at 2, 7-8, 9-10; Pet. Ex. 11 at 1-2. The petition was filed while petitioner was undergoing extensive treatment. Throughout the pendency of this matter, after extensive workup and numerous visits with specialists, the differential diagnosis was ADEM or CPM, the injuries listed in the Amended Petition. *See* Amended Petition; Pet. Ex. 1a at 15-16, 23, 29-30. But, as the amended petition noted, petitioner has never received a definitive diagnosis. Amended Petition at 1.

A definitive diagnosis is not necessarily required to support the filing of a claim in the Program. The Federal Circuit has made clear, "the statute places the burden on petitioner to make a showing of at least one defined and recognized injury." *Lombardi v. Sec'y of Health & Human Servs.*, 656 F.3d 1343, 1353 (Fed. Cir. 2011) (affirming a special master's decision to dismiss a petition when the petitioner could not establish that she had any of the three diagnoses alleged). In the event that a petitioner has not received a definitive diagnosis, "[t]he function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine based on the record evidence as a whole and the totality of the case, whether it has been shown by a preponderance of the evidence that a vaccine caused the [petitioner's] injury." *Lombardi*, 656 F.3d at 1352-53 (internal

14

citation omitted). Thus, where "the existence and nature of the injury itself is in dispute, it is the special master's duty to *first determine* which injury is best supported" by the evidence before applying the *Althen* test to determine causation. *Id*. at 1352 (citing *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1345 (Fed. Cir. 2010).

Had this case proceeded toward entitlement, petitioner would have had to have demonstrated that she suffered from one of the injuries alleged in her amended petition, or the injury best supported by the evidence would have had to have been determined, in addition to proving causation under *Althen*. *Broekelschen*, 618 F.3d at 1346. However, this case was dismissed once a definitive diagnosis could not be made and before expert reports were exchanged. A petitioner's burden for reasonable basis is much lower than that required to prove entitlement; reasonable basis is satisfied when there is "more than a mere scintilla" of objective evidence supporting a reasonable inference of causation. *Cottingham,* 154 Fed. Cl. at 795 (quoting *Sedar*, 988 F.3d at 765).

Respondent correctly noted that contemporaneous medical records "provide reliable, trustworthy, and persuasive evidence." Response at 6; *see Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *but see Kirby v. Sec'y of Health & Human Servs.*, 993 F.3d 1378, 1382-83 (Fed. Cir. 2021) (clarifying that *Cucuras* does not stand for proposition that medical records are presumptively accurate and complete). Petitioner was diagnosed with ADEM or CPM which her treating neurologist documented as temporally associated with receipt of a flu vaccine. Pet. Ex. 1a at 16, 23, 29-30; *see also id*. at 4-6, 38. ADEM[24] following flu vaccine has been compensated in the Program. *See Brown v. Sec'y of Health & Human Servs.,* No. 09–426V, 2011 WL 5029865, at *1 (Fed. Cl. Spec. Mstr. Sept. 30, 2011) (finding the petitioner proved their flu vaccine caused their ADEM); *Lenox v. Sec'y of Health & Human Servs*., No. 20-1152V, 2021 WL 6217321, at *1 (Fed. Cl. Spec. Mstr. Dec. 7, 2021) (joint stipulation for a petitioner who alleged a flu vaccine caused their ADEM); *Faulk v. Sec'y of Health & Human Servs.,* No. 17-295V, 2021 WL 6054919, at *1 (Fed. Cl. Spec. Mstr. Nov. 29, 2021) (same); *Colaianni-Abbott v. Sec'y of Health & Human Servs.*, No. 18-1898V, 2020 WL 5407925, at *1 (Fed. Cl. Spec. Mstr. Aug. 12, 2020) (same). This fact lends weight to the feasibility of filing her petition claiming the flu vaccine she received could cause ADEM.

Finally, special masters have underscored the importance of awarding attorney fees to encourage the participation of new attorneys in the Vaccine Program. As the Special Master stated in *Iannuzzi v. Sec'y of Health & Human Servs.*:

> Simply put, the ultimate purpose of Vaccine Act fees and costs awards is not to benefit the attorneys involved, but to ensure that Vaccine Act petitioners will have adequate access to competent counsel. . . Accordingly, when attorneys spend a reasonable amount of time and costs in representing Vaccine Act petitioners, such attorneys must be fairly compensated for their expenditures, in order to encourage attorneys to participate in future Vaccine Act cases.

---

[24] It appears that there have yet to be claims alleging CPM as the injury filed in the Program.

No. 02-780V, 2007 WL 1032379, at *11 (Fed. Cl. Spec. Mstr. Mar. 20, 2007), *rev'd in part*, 78 Fed. Cl. 1 (2007) (emphasis in original). Petitioner filed her claim on December 26, 2017 as a pro se litigant. Petition, ECF No. 1. Petitioner's attorney later substituted in as counsel to assist petitioner, who had not yet secured any medical records and was undergoing treatment for debilitating and serious health issues. This was Attorney O'Neill's first and only case in the Program so far. Once the records were secured and filed, counsel filed an amended petition alleging that petitioner suffered ADEM or CPM as a result of the flu vaccine. Shortly thereafter, petitioner withdrew her petition.

The filed medical records document a timeline of petitioner's condition beginning shortly after the flu vaccine, her neurologist documented "a temporal relationship with the flu vaccine as symptom onset occurred after receiving the flu vaccine," and ADEM has been causally linked to the flu vaccine supporting the feasibility of petitioner's claim and providing more than a mere scintilla of objective evidence that the flu vaccine could have caused her condition. *See Cottingham*, 971 F.3d at 1346. *See* Pet. Ex. 1a at 29-30.

For these reasons, the undersigned finds that this petition had a reasonable basis when filed and during the pendency of the matter until it was dismissed.

## IV.    Reasonable Attorneys' Fees

The Federal Circuit has approved use of the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. *Avera v. Sec'y of Health & Human Servs*., 515 F.3d 1343, 1349 (Fed. Cir. 2008). Using the lodestar approach, a court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" *Id*. at 1347-48 (quoting *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). Then, the court may make an upward or downward departure from the initial calculation of the fee award based on other specific findings. *Id*. at 1348.

Counsel must submit fee requests that include contemporaneous and specific billing records indicating the service performed, the number of hours expended on the service, and the name of the person performing the service. *See Savin v. Sec'y of Health & Human Servs*., 85 Fed. Cl. 313, 316-18 (2008). Counsel should not include in their fee requests hours, including those by paralegals, that are "excessive, redundant, or otherwise unnecessary." *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). It is "well within the special master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Id*. at 1522. Furthermore, the special master may reduce a fee request sua sponte, apart from objections raised by respondent and without providing petitioner notice and opportunity to respond. *See Sabella v. Sec'y of Health & Human Servs*., 86 Fed. Cl. 201, 209 (2009). A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen*, 102 Fed. Cl. at 729.

## 1.    Reasonable Hourly Rates

A "reasonable hourly rate" is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for

the District of Columbia" rather than "the rate in the geographic area of the practice of petitioner's attorney." *Rodriguez v. Sec'y of Health & Human Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349). There is a "limited exception" that provides for attorneys' fees to be awarded at local hourly rates when "the bulk of the attorney's work is done outside the forum jurisdiction" and "there is a very significant difference" between the local hourly rate and forum hourly rate. *Id.* This is known as the *Davis County* exception. *Hall v. Sec'y of Health & Human Servs.*, 640 F.3d 1351, 1353 (2011) (citing *Davis Cty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. EPA*, 169 F.3d 755, 758 (D.C. Cir. 1999)).

For cases in which forum rates apply, *McCulloch* provides the framework for determining the appropriate hourly rate range for attorneys' fees based upon the attorneys' experience. *McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[25]

Attorney O'Neill has eleven years of legal experience since her admission to practice. Motion for Fees at 1. However, this case was her first in the Vaccine Program. Thus, a reasonable hourly rate as it pertains to Attorney O'Neill has not yet been determined.

Here, Attorney O'Neill submitted an hourly rate of $295 for herself for 2018-2020. *Id.* at 1, 7-10. This is well below the forum rate for an attorney with her level of experience. Thus, I find the hourly rate billed by Attorney O'Neill to be reasonable.

## 2.  Hours Reasonably Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." *Saxton ex rel. Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). "Unreasonably duplicative or excessive billing" includes "an attorney billing for a single task on multiple occasions, multiple attorneys billing for a single task, attorneys billing excessively for intra office communications, attorneys billing excessive hours, [and] attorneys entering erroneous billing entries." *Raymo v. Sec'y of Health & Human Servs.*, 129 Fed. Cl. 691, 703 (2016). While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal. *O'Neill v. Sec'y of Health & Human Servs.*, No. 08-243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *McCulloch*, 2015 WL 5634323, at *26. Hours spent traveling are ordinarily compensated at one-half of the normal hourly attorney rate. *See Scott v. Sec'y of Health & Human Servs.*, No. 08-756V, 2014 WL 2885684, at *3 (Fed. Cl. Spec. Mstr. June 5, 2014) (collecting cases). And "it is inappropriate for counsel to bill time for educating themselves about basic aspects of the Vaccine Program." *Matthews v. Sec'y of Health & Human Servs.*, No 14-1111V, 2016 WL 2853910, at *2 (Fed. Cl. Spec. Mstr. Apr. 18, 2016). Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that,

---

[25] The 2015-2023 Fee Schedules can be accessed at http://www.cofc.uscourts.gov/node/2914. The hourly rates contained within the schedules are updated from the decision in *McCulloch v. Sec'y of Health & Human Sers.,* No. 09-923V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015).

in [her] experience and judgment, [is] reasonable for the work done." *Saxton*, 3 F.3d at 1522. In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen*, 102 Fed. Cl. at 728-29 (affirming the Special Master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 403, 406 (1997) (same).

Attorney O'Neill billed a total of 19.2 hours for this case. Motion for Fees at 1. She affirmed that there were no charges related to administrative tasks or for tasks performed by others. *Id*. at 4. Upon review of the hours billed by Attorney O'Neill, I find that her time was appropriately documented with specificity and her billing records did not contain charges for impermissible tasks, such as administrative duties or time spent learning about the Program. Therefore, no reduction is warranted.

## V.   Conclusion

Based on the foregoing, petitioner's Motion for Attorneys' Fees is **GRANTED.** The undersigned finds that it is reasonable to compensate petitioner and her counsel for **total attorneys' fees of $5,664.00.**

Accordingly, the undersigned awards:

> **A lump sum payment of $5,664.00 representing reimbursement for petitioner's attorneys' fees and costs in the form of a check payable jointly to petitioner and her counsel of record, Antoinette O'Neill of Parlatore Law Group.**

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[26]

**IT IS SO ORDERED.**

<u>s/ Mindy Michaels Roth</u>
Mindy Michael Roth
Special Master

---

[26] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.